IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

FILED
NOV 1 6 2020
CLERK, U.S. DISTRICT CLERK
WESTERN DISTRICT OF TEXAS
BY_____ DEPUTY

UNITED STATES OF AMERICA, PLAINTIFF
v
MICHAEL MARTINEZ, DEFENDANT          Case No. 1:23-cr-0034-LY(6)

REPLY TO ASSISTANT UNITED STATES ATTORNEY'S RESPONSE
CONCERNING DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE

Now comes defendant, and acting pro-se, who wishes to ask the court permission to refute, rebut and correct any/all statements made by Assistant United States Attorney ("AUSA") in Document 930 filed 11/04/2020 and received by defendant on 10 November 2020, via certified mail, at Federal Medical Center Fort Worth ("FMC") and to reiterate, add and/or correct any deficiencies, misstatements and/or problems with defendant's original Motion for Compassionate Release. Defendant apologizes for any need to correct and respectfully submits the following;

A. THE DEFENDANT AND BOP'S SARS-2/CoV ("COVID") PLAN

1. Defendant would like to contradict AUSA and the Bureau of Prison's ("BOP") website, press releases and legal releases to the court. The fact remains that the BOP has done an abysmal job at mitigating the SARS-2/CoV (COVID-19)("COVID") health crisis.

2. Defendant states to the conditions of the FMC and should be held as a true first hand account of the Real Conditions inside the BOP and, specifically, FMC, and to reassert the following, some of which was included in the original motion.

3. As AUSA stated (but did not quote the following), the BOP website offers blanket statements; "BOP professionals will continue to monitor the situation and adjust its practices as necessary to maintain the safety of prison staff and inmates while also fulfilling its mandate of incarcerating all persons sentenced or detained based on judicial orders." (bop.gov) This is far from accurate. They state and imply that the BOP and, specifically FMC, have the COVID-19 situation under control, even making an attempt to move towards normalcy by instituting 'Phase 9' of the 'Six-Phase Action Plan'. This is to show the public, and prisoners' loved ones, that they are beating this disease. This could not be further from the truth. Outside medical care by specialists was placed on indefinite hold starting in March of 2020, making it so defendant's conditions are still seen by non-specialized RN's, NP's, PA-C's, MD's and DO's. The institution still lacks proper sanitation (minimal or no soap or sanitizer in bathrooms, commissary limited and running out of cleaning materials of the same for sale) and the laundry that was cleaned twice a week is now only done once a week (non-printable memo issued 3 August 2020), even though inmates are only issued four to five changes of clothing. Defendant lives in a re-circulated air environment, meaning that if the infection should strike there, it would spread through the high care level inmates like wildfire. Social distancing is laughable as there are roughly 200 inmates in Dallas Unit and only 17 marked off 5.3 foot increments to line up for everything daily.

4. The BOP uses fancy statements to the public to pacify them even as their own employees are taking to the news outlets to voice how unsafe it is inside for prisoners and staff alike. NBC, EMS1, The Marshall Project, ABC, CNN, VICE News, LISA Newsletter, even Congress and Senate have set forth legislation to get the real numbers of the prison and jail COVID-19 infections publically released. Kareen Troitino, an Officers Union President, Kristian Morgan, a BOP Nurse, Anthony Koeppel, BOP Union Local Official, and Joe Rojas, Southeast Regional Union President of the Federal Prison Employees, numerous Whistleblower Complaints, members of the medical community like Dr. Homer Venters have all gone on record saying how bad this situation is, skepticism of real numbers, misrepresentation of said numbers and lack of oversight without proper equipment, training and testing which is detrimental to their jobs and the safety/health of all inmates. Defendant's fear is that the correctional officers and medical staff, who only receive a temperature check, can enter this facility asymptomatic and spread the virus to uninfected areas, or that asymptomatic new inmates will be placed on defendant's unit. It is a real threat to the safety of the inmates. Recent medical reports and scientific evidence has concluded that the current presentation of the COVID virus is with no temperature. This has been reported at numerous institutions and by medical doctors worldwide. The numbers of infected keep rising weekly.

5. In separate letters to Attorney General William P. Barr and BOP Director Michael Carvajal, Senators Elizabeth Warren (D-

Mass) and Richard Durbin (D-Illinois) suggest the Bureau "response to COVID-19 is failing..." (Washington Post, October 5) and also that the testing protocols don't go far enough and Senate is demanding answers on testing and transparency, even introducing a bill on August 6, 2020 that would require federal and local corrections facilities to collect and report comprehensive data on COVID-19 infections and death. (Id) Even stating, "COVID is OUT OF CONTROL [emphasis added] in prisons and jails across the country..." (Id)

6. The Washington Post further reported, "Federal prisoners, corrections staff, government inspectors and civil rights advocates complained for months that the BOP's strategies, while useful [in theory], are inconsistently applied. The overall inadequate response is leaving a vulnerable population at risk of infection and creating major vectors for transmission more than seven months into the pandemic." (Id) The BOP's COVID death toll "is mounting evidence that efforts to contain the virus within BOP facilities ARE FAILING [emphasis added]", Durbin and Warren wrote and was reviewed by the Washington Post. Congressional Representative Cheri Bustos and Senator Tammy Duckworth add to the pleas for more testing and that the BOP is not doing enough to protect inmates and staff alike.

7. The Sentencing Resources Counsel for the Federal Defenders organization on September 9, 2020, issued a blistering review of the BOP's COVID-19 response, quoting Joe Rojas, a BOP employee and Regional Vice President of the American Federation of Government Employees Council of Prison Locals. "They're making the virus explode." The reports identifies 19 BOP inmates "who died in BOP custody after filing and, in some cases, even after being granted requests for release" and note that "at least four individuals (Adrian Solorzano, Gerald Porter, Robert Hague-Rogers, and Marie Neba) have died of COVID-19 after either testing negative or after BOP erroneously pronounced them 'recovered'." It noted the Washington Post's description of prison response to COVID-19 as exemplifying a "culture of cruelty and disregard for the well-being of incarcerated people" and described FMC Carswell, a women's medical facility, as a "house of horror". (Sentencing Resource Counsel for the Public Community Defenders, the COVID-19 crisis in Federal Detention (Sept 9))(Robert Hague-Rogers was from FMC Fort Worth; Marie Neba from FMC Carswell, both in the Dallas/Fort Worth area and, at times, share staff between institutions).

8. The Council for Criminal Justice reported on September 2, 2020 that the COVID-19 mortality rate for prisons - including the BOP - is thrice that of the general public rate. To suggest that a person will be 'better provided' within a BOP facility is a cruel joke. State and federal prisons report nearly 7,000 cases per 100,000 people in prison, more than four times the rate of the general population. Prisons with the highest number of COVID-19 cases are located in the south and are prisons with over 1,000 inmates. The highest Mortality rates come from large prisons and those in the Midwest (FMC is in the Midwest, in the south and is over 1,000 inmates).

9. A Minnesota TV station reported September 4, 2020 that Ambjar Anderson, a chief steward of the BOP staff union at FCI Waseca, told it that a month ago [August 2020, during the very restricted prisoner movement];
"the prison received a couple of buses of inmates. One bus was mostly comprised of positive COVID-19 cases."
"We've had the proper PPE in place and that's what helped us mitigate it so far."
Anderson was quoted as saying, but "it's really hard when the BUREAU SENDS A BUSLOAD OF THEM. The number - it's spreading - because it's a prison and IT'S HARD TO SOCIAL DISTANCE." Anderson told the station. "We have staff who have families and communities that they are living in and going to and they care about and they don't want to pass it around to everyone, yet now it's spreading in our institution." [Emphasis added]
(KIMT-TV, Rochester, MN, Outbreak Concerns at FCI Waseca (Sept 4)) This nullifies any claim to "Limited Prison Transfer" of the BOP, and verifies the threat to all inmates within the BOP.

10. With everyone questioning the BOP on its numbers, the validity of its statements and polished responses, Defendant still contends that the BOP is not doing a good enough job in its role of protection that is assigned to it. The current scientific evidence does not support the BOP stance. Therefore, Defendant reasserts a claim to 'Extraordinary and Compelling Circumstance' under 1B1.13 and refutes the assertion that the BOP is doing a good enough job at protecting the Defendant. See also; United States v Zullo, No. 19-3218-CR, 2020 WL 5739712 (2nd Cir. Sept 25, 2020) Re: Note (4). See also: ACLU v BOP, Case No. 1:20cv3031 (DDC, filed Oct 21, 2020).

11. Despite bipartisan pleas for the BOP to recognize heightened vulnerability to COVID complications as an "extraordinary and compelling" reason for Compassionate Release, the BOP has not amended its Compassionate Release Policy since January 2019. Furthermore, the BOP is "overwhelmed by the unique challenges COVID-19 presents within correctional institutions," leading to its apparent inability to adjudicate the thousands of COVID-19 related requests before it, as discussed in United States v Connell: "[T]he BOP seems to have "predetermined" the Compassionate Release issue by its failure to respond to the petitions before it. For example, in the span of 15 days in early April, the BOP had received 550 compassionate release requests from inmates in one federal prison. It had responded to 7. All 7 were denied. Furthermore, a recent canvas of all federal and community public defender offices nationwide found not "a single BOP-initiated motion for compassionate release (that was not already initiated pre-COVID) has been made during the current crisis." 2020 WL 2315858, at *5(N.D. Cal. May 8,

2020)(internal citations omitted)(concluding accordingly that exhaustion was futile).

12. Other courts have stepped in to fill the void created by the BOP; United States v Sanchez, No. 95-cr-421-MGC, DE 421 (S.D. Fla. Apr 27, 2020)(granting compassionate release, over objection, from the life sentence to 76-year old drug conspiracy defendant with various underlying medical conditions); United States v Suarez, No. 18-cr-20175-MGC, DE 180 & DE 185 (S.D. Fla Apr. 202, 2020)(granting compassionate release, over objection, to defendant with diabetes, asthma and cancer in remission); see also United States v Lima, No. 16-cr-20088-RNS, DE 137 (S.D. Fla. May 11, 2020)(recognizing that Courts in their District have "repeated [ruled] that if an inmate has a chronic medical condition that has been identified by the Centers for Disease Control as elevating an inmate's risk of becoming severely ill from COVID-19, that condition may constitute 'extraordinary and compelling reasons.'"; collecting cases); United States v Rico, 19-Cr-20375-DPG, DE 51 (S.D. Fla May 14, 2020)(granting compassionate release, over objection, to 75-year old defendant with hypertension, COP, Asthma, and cachexia, among other conditions); United States v Barbuto, No 18-cr-80122-DMM, DE 314 (S.A. Fla Apr 28, 2020)(granting compassionate release, over objection, due to his age, cancer, and serious heart condition)l Hope, No 90-cr-06108-KMW, DE 479:7 8 (recognizing that "COVID-19 has dramatically altered the context in which courts are considering compassionate release request," and granting release, over objection, in part because "the current pandemic must be seen to alter" whether defendant's medical conditions are "severe enough to warrant compassionate release"); United States v Oreste. 14-cr-20349-RAS, DE 200(SD Fla April 6, 2020)(granting unopposed compassionate release and underlying special condition of home confinement due to COVID-19 and defendant's underlying medical conditions).

13. Courts around the country have similarly granted compassionate release to defendants who are particularly vulnerable to COVID-19, often over objection from the government.

14. The CDC has also cited study results indicating that as a Hispanic man, the defendant faces a relevant risk of death that appears higher. See http:www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/racial-ethnic-minorities.html ("Among COVID-19 deaths for which race and ethnicity data were available, New York City identified death rates among Black/African persons (92.3 deaths per 100,000 persons) and Hispanic/Latino persons (74.3) that were substantially higher than that of white (45.2) or Asian (34.5) persons.").

B. ATTORNEY GENERAL BARR'S MEMORANDUM TO THE BOP

15. On 26 March 2020, and later on 3 April 2020, US Attorney General Barr issued memoranda to the BOP directing the BOP to "Prioritize the use of your various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing COVID-19 Pandemic." On 27 March 2020, President Trump signed into law the CARES ACT of 2020, which temporarily expanded the scope of the "Statutory Authorities" to which the Attorney General referred. He also declared a National State of Emergency. See 85 FR 15337(March 13, 2020)

C. COURT CASES TO SUPPORT

16. The court did not anticipate COVID at the time of sentence. To be fair, the courts are divided on how to properly protect the inmates in this time of crisis. A significant risk of injury or illness or death cannot be considered approaching punishment for defendant's instant offense. See eg, Helling v McKinney 5CR US 24, 33-35(1993)(Holding that the Eighth Amendment to the constitution requires that inmates be furnished with the basic human needs one of which is "Responsible Safety" that "cruel and unusual punishment to hold convicted criminals in unsafe conditions" and that unreasonably exposing prisoners to the risk of death or illness may violate this Eighth Amendment); see also Wallis v Baldwin, 70 F.3d 1074, 10766-77 (9th Circuit 1995); Allen v Kramer, No 1:15cr-01609-DAD-MJS(PC), 2016 US Dist LEXIS 115024 at *16-21, 2016 WL 4613360 [ED Cal. Aug 17, 2016); Brown v Mitchell, 327 F. Supp 2d 615,650(ED Va 2004)(finding the law "clearly established" that a custodial facility may not knowingly expose an inmate to an "unacceptably high risk of the spread of contagious disease")

17. Other federal judges have granted relief under 3582(c) Compassionate Release motions filed by inmates who are vulnerable to the COVID-19 pandemic and have lengthy terms left to serve. United States v Stone, 2020 WL 342952, at *1 (WD Ark. June 23, 2020)(an inmate suffering from asthma, hypertension and polycythmeia vera was sentenced in 2009, for 150 months, release date is now August 2020 with the Court holding "...as the first wave of viral infection in this country has not yet passed and the number of infections continues to climb"); Unite States v Rainone, 2020 WL 3468307, at *1 (ND Ill. June 19, 2020)(projected release date was September 2028 on a 180 month sentence sixty-five year old inmate with skin cancer, cataracts, liver disease, heart issues, breathing. "1B1.13 - this fourth factor evidences broad discretion for the BOP and courts in determining what constitutes an extraordinary and compelling circumstance..." holding the most important factors involve medical and the COVID-19 crisis); United States v Fields WL 3129056 at *1 (WD La. June 11,2020)(37 year old inmate with sacriodosis at FMC Fort Worth had 38 months left on 180 month sentence and scheduled release date of September 2023; Government agrees that 1B1.13 can be satisfied by chronic medical condition that substantially diminishes the ability of the defendant to provide self-care within...and the ability to guard against serious injury or death as a result of COVID-19 is substantially diminished); and the Unites States v Almontes, 2020 WL 1812913 (D. Conn, April 9, 2020)(262 month sentence for cocaine and firearm the court discuses how the BOP "fell short in its gatekeeper role". Found "nearly all district courts hold that- --since the FSA's passage---Section 1B1.13 is not binding but is, rather, helpful guidance." Further, "at least one court has considered the BOP's indifference to an inmate's urgent medical needs as a factor contributing to an extraordinary and compelling reason for reducing the inmate's sentence--failure to address medical needs warrants release)

18. Unless the court acts to ensure that Defendant is not compelled to serve his term under exceedingly harsh and dangerous existing circumstances, the defendant will face an untenable risk of infection and death. In the interim, he will experience unduly harsh conditions of confinement this Court could not have anticipated nor intended. He should be permitted to complete the remainder of his sentence in home confinement.

D. THE 3553(a) FACTORS THAT MITIGATE IN FAVOR OF A REDUCTION IN DEFENDANT'S PRISON TERM

19. Section 3582(c)(1)(A) directs that, in deciding whether to reduce a sentence, the sentencing court should "consider the factors set forth in [18 USC 3553(a)] to the extent that they are applicable." The 3553(a) factors support defendant's motion. As the court is aware, Defendant forthrightly admitted misconduct in this case.

20. Finally, Defendant suggests a sentence of home confinement with electronic monitoring will allow him to seek and obtain urgently needed medical evaluation and care for his pre-existing conditions. Home confinement is, in its own way, appropriate and suitable for punishing Defendant, given the COVID factors. Defendant will be closely monitored by the Court's probation department and subject to unannounced visits, drug use surveillance, and similar intrusive reaches into his home and life. It is among "the kinds of sentence and the sentencing range established for" this Defendant that will balance his needs for medical care, safety from re-infection and the needs of society to be protected from someone serving a felony sentence.

### E. IMMINENT RISK OF DEATH, INJURY OR HARM TO DEFENDANT

21. When COVID first emerged at FMC, the management plan by the BOP was that inmates would be locked down into their housing units. That has not changed. Using the 'Six-Phase Plan' for Influenza (FLU) Mitigation Epidemic Plan, the BOP calculated some inmates would become ill, then the virus would simply 'burn out', then those who became sick and survived would have long-term immunity and conditions would eventually return to normal. Those who did not become ill would be subject to no further risk after 'burn out'. This theory is now demonstrated to be completely ungrounded; inoperable There is no long-term immunity. Hence, the infections will be passed back and forth endlessly in close-quarters environments. No government in the world or agency has a handle on COVID at present time. As of 27 October 2020, COVID is present in 120 of the 122 BOP facilities (LISA Legal Newsletter)

22. As time and experience have shown, that plan was and is fatally flawed. Some inmates at FMC have caught the virus, recovered and been hospitalized again for reinfection or died. The disease is now known to cause identifiable major-organ system damage and a foreseeable short lifespan. Including, scientists at Oak Ridge National Labs announced 13 September 2020 that supercomputer analysis of COVID-19 suggests the virus triggers a 'bradykinin storm' in the body. The researchers found that some people with the coronavirus may produce bradykinin - a chemical that regulates blood pressure in extreme excess, according to Business Insider, throwing respiratory, gastrointestinal and neurological pathways off balance. The theory aligns with researchers' growing view of the coronavirus as a vascular disease instead of a respiratory one. Research has shown that COVID-19 can lead to blood clots, leaky capillaries and inflamed blood vessels, which is why some patients may experience heart damage or stroke.

23. As of 23 August 2020 on CDC.gov, the CDC listed that "Currently, those at GREATEST RISK [emphasis added] of infection are persons who have had prolonged, unprotected contact (i.e.. within 6 feet for 15 minutes or longer) with a patient with confirmed SARS/CoV-2 infection, regardless of whether the patient has symptoms. Persons frequently in congregate settings (eg. homeless shelters, assisted living facilities, college or university dormitories, prison) are at increased risk of acquiring infection because of the increased likelihood of close contact. Those who live in or have recently been to areas with sustained transmission may also be at higher risk of infection. All persons can reduce the risk to themselves and others by wearing a mask, practicing physical distancing, washing their hands often and taking other prevention measures." as once can see, regardless of medical histories, a prison places one at greatest risk.

### F. EMERGENCY RELIEF SOUGHT BY MOTION

24. In their totality, all of these facts, including the loss of limbs and ambulation, and constitute the extraordinary and compelling circumstances described in 3582(c)(1)(A)(i) that warrant a change in this sentence. No one can actually prove that they are no longer a threat to society, nor that they have changed their ways, they only have their word until given the opportunity to prove such with their actions once given the chance.

25. Even if that does not satisfy 1B1.13, defendant asks the court to please see; United States v Zullo, No. 19-3218-CR, 2020 WL 5739712 (2nd Cir. Sept 25, 2020) RE: Note (4)

26. Defendant is statutorily eligible to directly seek this relief. Relief is warranted in light of 'Extraordinary and Compelling" Circumstances of defendant's current imprisonment. The medical conditions of the Defendant alone are an extreme risk factor and not receiving any medical care for the conditions that predate COVID, nor anything since, has only increased his risk. They spell doom. This has not changed. As of 10 October 2020, all outside medical visits (except for an emergency) are still suspended. Specialists are not allowed to come into the facility as much as they need to for their patient load, and are only afforded telephone consults with their patients that can not be taken to them on the one or two days they can come on the facility. The specialists ultimately have to rely upon the untrained opinions of the non-specialized providers that view the problem(s), and/or photograph the problem(s) and forward that to the specialists. People in the Defendant's Unit (Dallas Medical) have had severe problems go untreated due to this problem.

### G. CONCLUSION

27. Defendant would like to tell the court that he is not a member of the Texas Syndicate. He has consistently denied such and states to the contrary. He asks that the court accept that he has tried to get his attorney to change that in his PSR as untrue (PSR para 93). The Defendant further states a request for counsel to be assigned to get this changed in his PSR (this has no bearing on the current Instant Motion).

28. Defendant would like to correct the AUSA's statement as to the number of COVID at the FMC (pg 2 of Response, Section B para 3) "Although six inmates there have died of COVID-19, 512 inmates have recovered", and, "3 inmates testing positive for COVID-19 at Fort Worth FMC." (Id). Citing the 27 October 2020 statistics offered by the BOP on that date per their website. However, the numbers were actually 4 inmates positive, 12 inmates have died and 626 recovered, which was a gain of three inmates catalogued for the vital statistics offered by the BOP and FMC from the previous day. AUSA failed to mention that there were also 10 staff members positive and 6 recovered on that date, proving the BOP can not even keep their own people safe from infection. Of the 10, 1 staff member had been sick since 27 June 2020, a staggering amount of time.

29. As of 10 November 2020 there are 3 inmates ill, still the 12 that have expired and 601 recovered while there are now 4 staff ill and 15 recovered. The numbers keep yo-yoing, proving that BOP and, particularly, FMC is unable to manage the disease and it is only a matter of time before COVID hits Defendant's Unit.

30. Defendant would like to point out that the numbers, as listed by BOP and in their totality, do not tell an accurate story of the true numbers at FMC. If one were to add the 3 sick with the 12 deaths and add in the 601 recovered for 10 November 2020, the total accounted for cases at FMC is only 616 inmates. However, there is currently NO accounting for OVER 34 inmates as OVER 650 inmates were sick with COVID. There is no listing for where those inmates went. This makes even the officials count suspect (please see #5 and #6 of this Reply). With no real accounting for the numbers of people currently infected or for those recovered (Id.), Defendant asserts that the BOP is failing in its role as a protector of the inmates that are serving their just sentences, and has become merely a warehouse that is sublet to the same problems of accountabilities as the same, only this warehouse is keeping human bodies as the goods.

31. The court held in United States v Jackson (USDC ED Ark, Cent Div Little Rock) Case 4:18-cr-00346-BSM (CM/ECF 57) (Miller, J)(judgment filed 07/30/20) at pages 5-6 (a case turning in part on the conditions at the FMC [Fort Worth] and the current lack of adequate medical care) "The crime for which Jackson was sentenced, 18 USC section 1349, is not punishable by life imprisonment, and the [FMC's] inability to provide the medical care promised at sentencing could be life threatening." So it is with this defendant. Like Jackson, Michael Martinez, too, would like a chance at timely medical care.

Respectfully Submitted by,

*Michael Martinez*
Michael Martinez, pro-se
#01715-380
Federal Medical Center
PO BOX 15330
Fort Worth, TX 76119

I affirm that the above reply is true and accurate to the best of my abilities, and that a copy of this reply was sent, via United States Postal Service to;

Daniel Guess, Esq.
Assistant United States Attorney
903 San Jacinto, Suite 334
Austin, TX 78701

*Michael Martinez*
Michael Martinez, pro-se



Michael Martinez # 01715-350
FMC Ft. Worth.
P.O. Box 15330
Ft. Worth, Texas
76119

U.S. District Court (Clerk)
Western District of Texas
United States Courthouse
501 W. 5th Street, Suite 1100
Austin, Texas
78701

SCREENED BY CSO
11 6 2020

RECEIVED
NOV 16 2020
CLERK, U.S. DIST...
WESTERN DISTRIC...
BY_____ DEPUTY

NORTH TEXAS P&DC
DALLAS TX 750
THU 12 NOV 2020